**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Andrew Jones, | Case Number: 1:18-cv-4099 |
| *Plaintiff,* | Date: July 17, 2018 |
| -a*gainst*- | **COMPLAINT** |
| The Young Turks, Inc., | **Violation of Section 107 of the NYCHRL**, |
| *Defendant.* | **Violation of Section 296 of the NYSHRL,** |
| | **Violation of Title 7 of the Civil Rights Act.** |
| | **JURY TRIAL DEMANDED** |

## INTRODUCTION

1. Plaintiff Andrew Jones is a citizen of the state of New York and is currently domiciled in Kings County.

2. Defendant The Young Turks, Inc. (hereinafter "TYT") is a Delaware corporation, with its principal place of business in Culver City, Los Angeles County, California.

## JURISDICTION

3. This District Court has subject matter jurisdiction over Counts I (Violation of New York City Human Rights Law) and II (Violation of New York State Human Rights Law) because the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000 pursuant to 28 U.S.C. §1332.

4. This District Court has subject matter jurisdiction over Count III (Violation of Title VII of the Civil Rights Act) pursuant to 28 U.S.C. §1331.

## STATEMENT OF THE FACTS

Perceived Differential Treatment in Hiring and Evaluation of Work Product

5. In April 2017, TYT announced that they would be hiring a single new field reporter.

6. Cenk Uygur, the CEO and Founder of the TYT, stated that the decision on who to hire was given exclusively to Johnathan Larsen.

7. Larsen interviewed multiple candidates, including Plaintiff Jones, and Naomi LaChance.

8. Plaintiff Jones had considerable experience relevant to the job as he had worked for nearly a decade as a paid journalist since graduation from Boston University in 2009 at outlets ranging from The Intercept to the Guardian, prior to interviewing for the position. At these jobs, he reported and investigated issues in sports and politics.

9. Ms. LaChance, by contrast had no paid, post-graduate employment as a journalist prior to her interview at TYT. Instead, her sole experience was a handful of internships while studying at Bard College, which she graduated from in 2016.

10. Plaintiff Jones is black and Ms. LaChance is white.

11. Despite Plaintiff's substantially superior experience, Defendant Larsen chose to hire Ms. LaChance for the position.

12. At this point, TYT had one black employee, who was a personal friend of the CEO, at the time out of approximately 70 individuals and no black reporters.

13. Ms. LaChance was introduced by Mr. Uygur at a company party where he expounded on her substantial experience and that she was a recipient of a prestigious award, all of which made it surprising that she was not "89 years old."

14. At no point did he correctly describe this experience as that of an unpaid college internship, nor that the prestigious award was actually a high school award.

15. Ms. LaChance was more honest when asked about the award, stating Mr. Uygur "extremely exaggerated . . . It's just a high school award."

16. Mr. Uygur explained that Ms. LaChance would be a "new cop on the street" for

"Wall street" and government officials because TYT "loves looking into the effect of money in politics."

17. A couple of weeks later, Defendant Larsen then contacted Plaintiff to see if they could speak. At this meeting, Defendant Larsen stated that TYT determined they had "additional money" to hire a second field reporter.

18. At the conclusion of the meeting, Defendant Larsen offered Plaintiff this newly created job.

19. Defendant described the job as one where Plaintiff would be permitted to write about news, politics, and sports, and that he would be provided a budget to travel for investigative work.

20. On Plaintiff's first day at work Larsen set out no guidelines or structure for Plaintiff and was unaware of even basic responsibilities, such as necessary passwords.

21. Within a week, Plaintiff submitted two articles to be published on the TYT's Medium page. For the second article, Larsen had a problem and stated that "it wasn't up to his professional standards."

22. Plaintiff asked what was wrong with article, but Larsen ignored him.

23. The article was eventually published by Larsen without any changes from Plaintiff's initial submission.

24. The article was, in fact, well written and well edited. This is not surprising given that Plaintiff has drafted multiple articles for well-known and well-respected media outlets, including from the Guardian to Salon to Vox, and had his writings featured on MSNBC, the Nation, and the Wall Street Journal.

25. Moreover, Plaintiff had more experience than Larsen himself at both drafting and editing print journalism.

26. Critically, Ms. LaChance, with less experience and skill, was never denigrated by Larsen for writing that was inadequate. A simple comparison of the work of the two will demonstrate that Ms. LaChance's work is not superior.

27. The article was well received by many and a simple review of the article, "How Bernie Sanders' Brand isn't 'Damaged,' But Rather Enhanced, By Rob Quist and Heath Mello's Defeats," demonstrates it was capably written.

28. By June 2017, it became clear that despite the job description, and Larsen's promises, that Plaintiff would not be provided with opportunities to travel to engage in investigative work as multiple requests had been denied by Larsen.

29. This was even though Ms. LaChance and the other all white employees with the same job title of "Field Reporter" were provided the opportunity to travel.

30. In early July, Plaintiff was finalizing an investigative piece on Comcast's media outlets misleading its viewers about potential bias. This is because they omitted disclosures that their owner, Comcast, was heavily lobbying congress and the FCC to repeal net-neutrality.

31. Plaintiff provided Larsen with the article, but he sat on the article rather than doing his job. Larsen then opted to leave for vacation prior to finishing or providing any comment.

32. Thus, Plaintiff was forced to turn to another employee to edit the article.

33. The article was a dramatic success; so much so that the CEO of the company, Mr. Uygur, featured it on TYT's flagship broadcast and touted it as an "exclusive."

34. Larsen would later falsely claim that the article to be much less of a success and instead called it "unoriginal" and "unworthy of publishing" in an attempt to create a pretext for later termination.

Initial Complaint Over Perceived Racial Discrimination

35. Given the praise, Plaintiff reached out to the CEO, Mr. Uygur, to discuss the difficulties he was having with Larsen.

36. About a month later, on or about August 5, 2017. Mr. Uygur finally contacted Plaintiff personally via phone. Plaintiff laid out that he felt that Larsen was treating him unfairly in multiple regards: including a lack of a travel budget, different and shorter deadlines, higher and ever-shifting standards for articles, slower response times, and general hostile behavior. Plaintiff also indicated that it was his belief this unfair treatment was due to Plaintiff's race and he stated as much.

37. Mr. Uygur ignored all of his complaints and instead impliedly threatened Plaintiff stating that his complaints and the method of his complaining about perceived unequal treatment by his supervisor could be a "fireable offense" in and of itself. He further stated that he should discuss his issues directly with the person who was committing the discriminatory acts.

38. Mr. Uygur would never respond directly to Plaintiff's complaints again.

39. Upon information and belief, Larsen was made aware of this complaint.

Transfer To TYT Investigates

40. A few days later, on or about August 8, 2017, Mr. Uygur announced that Defendant Larsen would be moved from the established TYT Politics section to the new TYT Investigates.

41. Despite having previously complained about Defendant Larsen, Plaintiff remained under his supervision, along with Ms. LaChance and another journalist Michael Tracey.

42. Larsen's first proposed "exclusive and original" reporting idea was for the team

to investigate the effects of the Bush tax cuts on corporate behavior, even though this "news" would be a decade old.

43. Plaintiff told Larsen of this and that this would take him away from his popular work on net neutrality. Larsen reiterated that his net-neutrality work was not news and further rejected the concern about the age of the tax cuts saying that old stories can still be valid if new angles were found.

44. Larsen further stated that it was his hope that each member of the team develop a few "quick turnaround, enterprise reporting" stories so that it looked like TYT investigates was busy and on track, when in reality its launch date would be pushed back multiple times.

Escalation of Differential Treatment

45. On August 21, 2017, Larsen would assign one of these stories to Plaintiff: to report on the Presidential pardon of Joe Arpaio. The problem with Larsen's new "exclusive and original" story was that it was already extensively covered by major outlets for multiple days.

46. Larsen gave no timeline for its completion other than the general statement that a few be done per week by the entire team.

47. However, the next morning at approximately 6:00 a.m., Larsen emailed Plaintiff a 5-paragraph list of grievances. The email would however focus only on two issues and, for the first time, Larsen would CC a high-level human-resource employee, Jack Gerard.

48. One was that Larsen falsely stated the Arpaio story was late even though Larsen had set no deadline and the story was issued to Plaintiff fewer than 24 hours prior. Larsen demanded that Plaintiff inform him of problems when he is "unable to complete assignments on time" rather than "wait[ing] until the last minute."

49. Larsen would routinely reference this "late submission" as proof of "insubordination" in the future.

50. This violation of his "expectations" was entirely unfounded as Larsen never set a timeline beyond a few quick stories a week for the entire team. As such, there was no deadline so there was no way to "wait until the last minute."

51. Moreover, Plaintiff was finished with the article and was proofreading it to submit by start of business at 9:30am.

52. Mr. Uygur would then read Plaintiff's article on TYT's flagship program as "another example of good journalism" from our reporters.

53. This would not be the first time that Larsen invented deadlines only for Plaintiff.

54. The second issue Larsen raised was that Plaintiff was not checking in with him in the "morning," but rather allegedly "a few minutes before noon every day" because that is "the equivalent to showing up for work." Moreover, even just calling "once by phone . . . is not acceptable," rather Plaintiff should call multiple times until he reaches Defendant.

55. First, Larsen is apparently unable to make phone calls after a "missed call" notification is received.

56. Second, Larsen, even by his own admissions, routinely does not answer his employees' calls.

57. Third, it is telling that Larsen waited 4 months into Plaintiff's employment to reprimand him about violating such a simple and important rule.

58. Fourth, no call requirements were strictly enforced in this matter on either Ms. LaChance or Mr. Tracey and as such, they were never reprimanded for failing to call every day until they actually reached Larsen.

Proof of Defendant's Arbitrary and Capricious Behavior

59. The next day, on August 23, 2017, Larsen and Plaintiff would speak by phone.

60. During the call, Plaintiff simply asked for some guidelines to conform his behavior to, but Larsen refused any guidance, stating "You keep looking for rules, and what I'm telling you is, this is a case-by-case business. This is an inherently adversarial relationship. I can't give you rules that are going to apply in even most situations."

61. Larsen went further stating that Plaintiff was not providing enough "energy" or "passion" to the quick stories and that he "should be an active advocate on behalf of the stories" as much as his major investigative pieces.

62. Larsen was critical because he expected, without ever stating as much, that Plaintiff was supposed to draft quick stories, but also investigate people on the ground, government officials, etc. Plaintiff was still denied

63. Any problems with such an approach were simply met as "insubordination."

64. The conversation highlights Larsen's behavior for what it is: intentionally arbitrary and capricious. He refuses to layout any rules, let alone standards, or even deadlines. He expects Plaintiff to know and comply with unstated rules nonetheless. He further expects that Plaintiff finish stories in a matter of hours, but yet also investigate these "quick" stories with the same vigor as his major investigative projects. Such a tension is irreconcilable and thus Larsen's "expectations" are merely a thinly veiled attempt to manufacture a pretext.

Second Major Complaint to Higher Management Concerning Racial Bias

65. Feeling that Larsen's arbitrary and hostile behavior had reached a new level, Plaintiff, on August 23, 2017, contacted the same high-level employee of human resources, Mr. Gerard, to explain that Larsen was 1) dishonest and arbitrary in his

reprimand and 2) a rationale for why Plaintiff believed that there was clear evidence of a racial bias on Defendant's part given that the other two reports in TYT investigates were not being treated as arbitrarily or as harshly.

66. In response, David Koller, the head of HR and one of the founders of TYT, called Plaintiff to discuss his concerns. Plaintiff explained to him some of Larsen's arbitrary behavior and that Plaintiff was targeted with different and higher standards than the white reporters, all while being given fewer resources.

67. Mr. Koller acted concerned and stated he would start an investigation into the matter given the gravity of the charges. However, Plaintiff never heard from him directly again, Plaintiff never heard from anyone else concerning an investigation being conducted or completed, so it is highly likely no investigation ever occurred.

68. Moreover, Mr. Koller is publicly known for making racist comments. He referred to less affluent black people in southern America who relax on their porch on hot summer days as "po' black people just hanging out in the heat." This qualified these black people as "negroes [who] were the real deal."

69. Beyond racist comments, this was also the same person who decided to "launch a bottle rocket in the parking lot" of the "Civil rights Museum, which was made [out of] the motel where MLK was assassinated."

70. This investigation was critically important because an investigation into Larsen would have uncovered that he was subject to multiple discrimination complaints during his tenure at MSNBC, if that was not already known by TYT when he was hired.

71. An executive at the company on a call shortly after issued a veiled threat stating, "if this all works out you are under Larsen, but he may also discontinue your

1   services."

2   72. Upon information and belief, Larsen was made aware of this new complaint.

3   73. A few days later, on September 1, 2017, Defendant Larsen suddenly demanded

4        the first draft of Plaintiff's investigative piece into the tax cuts and jobs story.

5   74. However, when Plaintiff asked Ms. LaChance or Mr. Tracey if they were asked for

6        their drafts, each said no. Larsen would instead notify them on September 4, 2017

7        for a draft to be submitted on September 8, 2017, a week after he demanded

8        Plaintiff's without forewarning.

9   75. Despite the demand, Larsen would never comment on Plaintiff's draft. Instead,

10       thirteen days after the first request, on September 14, Larsen asked Plaintiff for a

11       second draft, despite having never commented on Plaintiff's first draft. Larsen

12       again provided no deadline.

13  76. On September 18, Plaintiff again reached out to Mr. Uygur, hoping he would

14       respond as he was in NYC, however Mr. Uygur ignored Plaintiff's pleas.

15  Retaliation By TYT

16  77. Two days later, Larsen, along with members of human resources, placed Plaintiff

17       on a probationary two-week evaluation.

18  78. When Plaintiff asked why, Larsen stated that he was an ineffective investigative

19       journalist as he had failed to create any original or exclusive content.

20  79. When Plaintiff reminded him of Comcast reveal which gained hundreds of

21       thousands of views online, was aired on the flagship network, and praised by

22       CEO Mr. Uyger, Larsen deflected by saying it wasn't up to his professional

23       standards because it was already widely known.

24  80. At this point, despite having started earlier, Ms. LaChance had not produced any

25       original or exclusive content, despite having a travel budget. Nevertheless, she

1   was not placed on administrative leave.

81. Plaintiff immediately contacted TYT's head of programming requesting a transfer back to TYT Politics or to TYT Sports stating he believed the issues were the result of problems solely with Larsen. The request was denied allegedly because no role existed.

82. The alleged purpose of the two-week evaluation was for Plaintiff to demonstrate that he could find topics worthy of articles. Plaintiff presented 5 different topics, all of which were rejected.

83. All were rejected, in part, because the proposed topics were incomplete, even though Plaintiff was not asked to deliver articles, rather topics.

84. One was rejected because another reporter had already covered a different angle, so Plaintiff's suggestion was probably a waste of time. This is despite Larsen's prior call on August 23 where he expressly advocated that Plaintiff look to angles not covered in old reporting.

85. Most surprisingly, two stories were rejected by Larsen even though they showed a tight connection between donor interests, contributions, and politicians' actions. One of the two stories was particularly compelling as it showed money from a cereal company to a congressperson who introduces legislation to reduce recall regulations on cereal is not "newsworthy."

86. This is stunning because TYT's principal focus is money and its corrupting influence.

87. The last story was rejected because it had already been discussed a month prior, in August, by another company, but otherwise had potential. Larsen acknowledges that it could have been a story, which is important because it is a change in his position from July where he rejected the story.

88. As the above shows, Larsen has no consistent methodology, but his positions are worse than mere chaotic incoherence. Instead, they are calculated positions to oppose whatever Plaintiff offers at the moment it is being offered, even if that position contradicts a prior position.

Escalation of Defendants' Retaliation to Termination

89. On October 5, as Plaintiff allegedly failed to meet Larsen's professional standards, TYT, through Mr. Gerard, pushed for Plaintiff to sign a severance package where he would waive his civil rights claims, receive approximately one month's salary, and resign. Mr. Gerard indicated resigning quietly was the best thing to do for his career.

90. Plaintiff refused.

91. A few days later, Mr. Uygur then contacted Plaintiff after months of either ignoring his pleas for help or directly threatening him for them.

92. On October 9, 2017, Plaintiff was terminated despite "noticeable" and "definite" improvements.

93. That same day Mr. Uygur publicly offered a position to an ESPN employee in TYT Sports, despite having told Plaintiff that the position was not available.

94. Plaintiff has been diligently searching for a new full time position since he was terminated, but has not obtained one.

95. Plaintiff filed a complaint with the New York Division of Human Rights and the Equal Employment Commission in January 2018.

96. The EEOC provided Plaintiff a Notice of Right to Sue on April 19, 2018.

COUNT I

*Violation of Section 107 of NYCHRL*

97. Plaintiff incorporates all above paragraphs as if fully set forth and repeated here.

98. New York City's Administrative Code's Civil Rights §8-107(2) further states, "It shall be an unlawful discriminatory practice for any person engaged in any activity to which this chapter applies to retaliate or discriminate in any manner against any person because such person has (i) opposed any practice forbidden under this chapter . . . "

99. Defendant TYT was put on notice of Plaintiff's complaints regarding Larsen's arbitrary and unequal treatment on more than one occasion. The first was on a call between CEO Uyger and Plaintiff. CEO Uyger did not take any action to assist Plaintiff, but rather warned Plaintiff about the risks of complaining. The second was in writing to human resources.

100. While Defendant TYT claimed they would investigate the matter, they did not. Instead, Defendant implemented the warning CEO Uyger provided Plaintiff. Two weeks later, Defendants placed Plaintiff on an "evaluation period" and then terminated him at the end of that period, despite "noticeable" and "definite" improvement and the fact that he had objectively outperformed his white colleagues.

101. Plaintiff complained to Defendant TYT's CEO about a potential racial basis for his disparate treatment. In response the CEO immediately informed him that such a complaint could be "a fireable offense."

102. This warning is likely to cause a chilling effect on complaints and is thus actionable retaliation.

103. After a perceived increase in differential treatment, Plaintiff again complained, this time to high level employees in TYT's human resources department. In response, Plaintiff was told that an investigation would take place. However, there is no indication that TYT actually performed an investigation of any kind.

104. Rather, within a few weeks of his renewed complaints, Plaintiff was placed on a probationary period of two weeks.

105. At the conclusion of the two week period, TYT noted Plaintiff's substantial improvement, but fired Plaintiff anyway.

106. This change in status to a probationary period subsequent termination is a material adverse change in the condition of Plaintiff's employment and would likely create a chilling effect on others, so it is actionable retaliation.

107. All of the foregoing caused Plaintiff considerable economic injury in the form of lost wages and a harmed reputation. It further caused him considerable emotional distress that escalated as he was treated in an illegal matter.

108. The foregoing also amounts to intentional and egregious illegal behavior warranting the imposition of punitive damages as multiple high level employees of TYT knowingly warned and terminated Plaintiff's employment because he brought a good faith complaint to stop perceived racially discriminatory behavior by Larsen.

<u>COUNT II</u>

*Violation of Section 296 of NYSHRL*

109. Plaintiff incorporates all above paragraphs as if fully set forth and repeated here.

110. New York's Executive law §296 states, "For any employer, labor organization or employment agency to discharge, expel or otherwise discriminate against any person because he or she has opposed any practices forbidden under this article."

111. All of the foregoing caused Plaintiff considerable economic injury in the form of lost wages and a harmed reputation. It further caused him considerable emotional distress that escalated as he was treated in an illegal matter.

<u>COUNT III</u>

*Violation of Title 7 of the Civil Rights Act*

112. Plaintiff incorporate all above paragraphs as if fully set forth and repeated here.

113. Title VII of the Civil Rights act, 42 U.S.C. 2000e-3(a) states, "It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter . . . "

114. All of the foregoing caused Plaintiff considerable economic injury in the form of lost wages and a harmed reputation. It further caused him considerable emotional distress that escalated as he was treated in an illegal matter.

115. The foregoing also amounts to intentional and egregious illegal behavior warranting the imposition of punitive damages as multiple high level employees of TYT knowingly warned and terminated Plaintiff's employment because he brought a good faith complaint to stop perceived racially discriminatory behavior by Larsen.

PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for a judgment in his favor as follows:

1. Compensatory damages and punitive damages in excess of $75,000 or as proven at trial for Defendants' violation of New York City's Human Rights Law, New York State's Human Rights Law, and the Federal Civil Rights Act;

2. For attorney's fees as provided by statute or contract;

3. For interest as provided by law;

4. For costs of suit incurred during litigation;

5. For other and further general and special damages in a sum according to proof at the time of trial;

6. For other such relief that the Court deems just and proper.

JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury for all the issues pleaded herein that are so triable.

Respectfully submitted,

HAWGOOD HAWGOOD & MORAN, LLP

/s/ Alexander D. Hawgood, Esq.
Alexander D. Hawgood, Esq.
*Attorney For Plaintiff Andrew Jones*
Alex@Hawgoodlaw.com
244 Fifth Avenue, Suite 2268
New York, New York 10001
(301) 439-0394